UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

OLIVIA A.C.,

                              Plaintiff,

                                                          **DECISION AND ORDER**
          v.                                               23-CV-578-A

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

                              Defendant.

_____

## I.    INTRODUCTION

Plaintiff Olivia A.C. brings this action against the Commissioner of Social

Security (hereinafter the "Commissioner"), seeking review of the Commissioner's

determination denying Plaintiff Supplemental Security Income (SSI) under the Social

Security Act. Plaintiff (Dkt. #5) and the Commissioner (Dkt. # 9) have filed cross-

motions for judgment on the pleadings. For reasons set forth below, the Plaintiff's

motion is **GRANTED,** to the extent that this matter is remanded to the Commissioner

for further administrative proceedings consistent with this Decision and Order. The

Commissioner's motion is **DENIED**.

### A. Procedural History

On August 5, 2020, Plaintiff, age 21, filed an application for Title XVI

supplemental security income, and subsequently, on April 19, 2022, Plaintiff filed an

additional application for child's insurance benefits based on disability. (T. 30; 84;

235-243; 263-264).[1]  In both applications, Plaintiff alleged disability beginning on January 1, 2020.

Plaintiff alleged disability based upon "dyslexia, anger problems, bipolar, and depression," and her claim was initially denied on January 13, 2021. (T.124, 134). Upon reconsideration, Plaintiff added claims based upon "asthma, an emotional problem, and learning problems," but such claims were also denied. (T. 139, 143).

Thereafter, Plaintiff sought a hearing, and on May 25, 2022, a hearing was conducted before Administrative Law Judge ("ALJ") ALJ Linda Harris Crovella. (T. 39-83; 153).  Plaintiff appeared and testified at that hearing, as did vocational expert Judith Harper. On September 27, 2022, the ALJ issued a decision denying Plaintiff benefits. (T. 14-38). On April 26, 2023, the Appeals Council denied Plaintiff's request for review and as a result, the ALJ's decision became the Commissioner's decision. (T. 1-6).  Thereafter, Plaintiff commenced this action.

### B.  Factual Background

Plaintiff, who was 20 years-old at the time of the alleged onset date of her disability, had a limited work history as a forklift truck operator, and also worked for brief periods (*i.e.*, part-time, a few months at a time) performing janitorial, warehouse, gardening, and retail clerking duties. (T. 29, 30, 84, 297-303).

---

[1] References herein preceded by "T" are to consecutively paginated, Bates-stamped pages within the administrative transcript of official proceedings in this case, set forth as Dkt. #5 on the Docket.

### 1.  Plaintiff's Educational Records:

Plaintiff did not complete high school and was in special education and on an IEP while in school.  (T. 335-344, 368-381, 388).  She was first evaluated for special education and related services in first grade and found to be eligible for special education under the category of "Multiply Disabled" and received resource room support as well as speech and language services. A triennial evaluation was conducted in June of 2007 and Olivia's classification was changed to "Specific Learning Disability." (T. 1024-1025).

In 2007, Plaintiff was tested on Weschler Intelligence Scale for Children (WISC-IV) and demonstrated a full-scale intelligence quotient (FSIQ) of 74. (T. 337). Three years later, in 2010, Plaintiff tested at an FSIQ of 80 on the WISC-IV. (T. 337). In 2012, speech therapy was recommended once a week for 30 minutes in a group setting to address memory, concept comprehension, and verbal expression (including social communication). (T. 336).

In the 2013/14 and 2014/15 school years, Plaintiff had an IEP for a learning disability, was in special education classes, and received weekly individual psychological counseling services. (T. 335). Because of her deficits, Plaintiff required: proximity to staff; verbal and nonverbal cues to stay on tasks; one on one assistance; having instructions and information read aloud to her in class, helping the teacher write notes/information to keep her focused during instruction, and having directions/assignments clarified and examples given when necessary. (T. 339).

In March 2015, as part of a psychological re-evaluation, Plaintiff was once again administered the WISC-IV and demonstrated an FSIQ of 60. (T. 1027). Her processing speed index tested at 58.  In reporting such scores, it was noted that Plaintiff's FSIQ score and some other scores could not be interpreted meaningfully because she displayed too much variability in the four Indexes that composed these scores. (T. 1024-1031).  The March 2015 test represented the most recent intelligence testing in the administrative record.

On June 23, 2015, Plaintiff, in response to concerns over her aggressive and violent behavior and inappropriate emotional and social reactions, underwent a psychiatric evaluation.  Her diagnoses included bipolar disorder of adolescence, ADHD, and learning disorders (reading, writing, and math). (T. 1038-1049).  Her IEP was continued with the same accommodations into the 2017 to 2018 school year. (T. 368-381).  She withdrew from school without graduating in November 2017. (T. 388).

### 2.  Plaintiff's Medical Records:

Plaintiff  has a treatment history for asthma and bipolar disorder (T. 727, 1188) and receives treatment for both with prescription medication. (T. 1180, 1188).

### a.  Spectrum Health and Human Services

On December 5, 2019, Plaintiff was evaluated at Spectrum Health and Human Services for an intake assessment.  She struggled with her focus, as her mind was "all over the place," she reported past diagnoses of autism, bipolar disorder, anxiety, depression, ADHD, and dyslexia.  She exhibited behavioral issues, in which she became defiant with others, and she struggled with mood instability,

depressive symptoms, isolating and withdrawing from others, as well as a suicide attempt in 2018. Her mood was dysphoric, and her affect was flat. Plaintiff demonstrated slow thought process and problems with abstract thinking, reasoning, fund of information, and general intellect capacity. (T. 543-584). On December 29, 2020, Plaintiff was discharged for loss of contact. (T. 720-721).

On January 20, 2021, Plaintiff returned to Spectrum for an intake assessment for anxiety, depressed mood, and learning disability symptoms. She was seeking assistance to obtain disability and was encouraged to return to counseling. She reported struggling with anger and identified both depressive and anxious symptoms, past suicidal ideation, and she met the criteria for autism spectrum disorder. (Tr. 797-804). At that time, she was diagnosed with autism spectrum disorder, unspecified depressive disorder, unspecified anxiety disorder, and unspecified bipolar and related disorder. (T. 712-713).

On April 20, 2021, Plaintiff once again presented at Spectrum for a psychiatric evaluation/medication management. Her limited intellectual functioning made it difficult for her to provide a medical history. (T. 789). She recently had a child and sought Aderall for her focus and custody of her baby. The notes indicate that she was somewhat guarded and not forthcoming; she had a history of sexual abuse; she had a history of irritability and anger and was easily agitated; she had a history of self-harm; she reported having visions while in church; she was assessed with history of bipolar disorder, depression, recent birth and questionable postpartum depression, and limited intellectual functioning. (T. 787-790).

About a month later, on May 25, 2021, Plaintiff again went to Spectrum for a psychiatric evaluation/medication management, after starting on medications previously ordered after Plaintiff's prior psychiatric admission at the Erie County Medical Center.  Her newborn son had been removed from her care due to neglect. Her affect was restrictive and flat, and her thought process was cognitively limited. She was assessed with limited intellectual functioning, postpartum depression, PTSD, history of Oppositional Defiant Disorder (ODD), and mild autistic spectrum; Lexapro and Risperdal were continued. (T. 782-786).

On September 29, 2021, Plaintiff was discharged after relocating to New Jersey because her biological father received custody of the child. (T. 915-917).

On January 25, 2022, Plaintiff returned to Spectrum for an intake assessment for counseling and medication management; she reported increased agitation, headaches, symptoms of depression and anxiety, suicidal ideation, and struggling to manage stress related to losing custody of her son. (T. 791-796).

On April 18, 2022, Plaintiff returned for a psychiatric evaluation/medication management.  She reported that she moved back to Buffalo, that her father had full custody of her son, and that she was off her medications.  She was assessed with limited intellectual functioning, postpartum depression, PTSD, history of ODD, and mild autistic spectrum.  New medications were prescribed.  (T. 767-771).

### b. Endeavor Health Services:

On August 31, 2018, Plaintiff underwent a comprehensive assessment at Endeavor Health Services and reported a history of PTSD, persistent depressive disorder, cutting/suicidal ideation, and possible autism.  She currently resided in the TRY Program after being homeless for six months.  She reported a significant history of trauma, including sexual assault.  She reported flashbacks, nightmares, cutting behaviors, having dead family members return to talk to her, depression, fatigue, hopelessness, and loss of energy.  The medical provider determined that Plaintiff would benefit from biweekly counseling sessions to address signs and symptoms of PTSD and depression.  On a mental status exam, she reported visual hallucinations, her mood was dysphoric, and her affect was flat.  She had difficulty recalling information. (T. 656-677).

On November 19, 2018, Plaintiff presented for an initial psychiatric assessment, and her diagnoses included: not otherwise specified (NOS) mood disorder; generalized anxiety disorder; panic disorder; PTSD; autism spectrum disorder; and borderline personality spectrum.  Medication was prescribed. (T. 1095-1097).

On December 31, 2018, Plaintiff was discharged due to loss of contact after last being seen in the office for counseling in September and for a psychiatric evaluation in November.  Her discharge diagnoses included unspecified depressive disorder, generalized anxiety disorder, panic disorder, PTSD, and autism spectrum disorder.  (T. 678-680).

### c. Southtowns Neurology:

On April 20, 2022, Plaintiff went to Southtowns Neurology for an initial consultation for headaches. (T. 1162). She was assessed with new daily persistent headache and anxiety disorder; medication was prescribed, and a brain MRI was ordered. (T. 1163).

### d. Erie County Medical Center:

On March 12, 2018, Plaintiff was treated at ECMC or fleeting suicidal ideation and attempts to cut her wrists with a box cutter razor. (T. 417). Superficial lacerations were noted on her bilateral forearms; she reported a history of cutting; she was calm and cooperative but exhibited thought-blocking, at times; she reported a history of sexual abuse and trauma; she noted the presence of visual hallucinations in the form of figures. (T. 418). She was seen rocking by staff and was referred to a crisis bed. (T. 419). On mental status exam, her mood was anxious; affect was restricted; insight was poor, limited; and judgment was limited. (T. 419). Her diagnoses included anxiety disorder, PTSD, dysthymia, anxiety, history of ODD, and previously diagnosed autism spectrum disorder, and a learning disability. (T. 420).

On April 16, 2018, Plaintiff again treated at ECMC for suicidal ideations because of her bad relationship with her mother; she also a reported history of depression and suicide attempts by cutting and drug overdose. (Tr. 400-401). She had been seen multiple times in the last couple of months with an apparent history of PTSD, persistent depressive disorder, and presumed autism spectrum disorder/

developmental disorder. (T. 401).  She was assessed with, *inter alia*, adjustment disorder with disturbance of conduct, autism spectrum disorder, provisional, and PTSD. (T. 403). The following day, the staff observed Plaintiff on the phone yelling and screaming and punching the walls. (T. 416).

On February 16, 2020, Plaintiff underwent a psychiatric evaluation for suicidal ideation; she was vague and uncooperative, giving brief answers and requiring many questions.  She indicated that she was upset about not being allowed to see friends anymore because the friend stole money from someone; she was quite dysphoric; she appeared older than her stated age with poor eye contact, distressed, and fair hygiene. Her attitude was semi-cooperative and defiant/ oppositional; behavior was in control and dramatic; speech was intermittent and minimal; mood was dysphoric; affect was restricted; intellectual functioning was below average; and insight and judgment were chronically limited. (T. 1254). Again, her diagnoses included adjustment disorder (mixed) and autistic spectrum disorder. (T. 1265).

On January 17, 2022, Plaintiff returned to ECMC for an allergic reaction. During her visit she reported some depression and the need to get her medications refilled. (T. 1271). Her diagnoses included cluster B personality disorder (borderline personality disorder), mild autism spectrum disorder by history, and possible mild intellectual disability. (T. 1275).

### 3.  Opinion Evidence:

On December 18, 2020, Plaintiff underwent a psychiatric consultative examination with Dr. Christine Ransom, Ph.D. (T. 749-752). Dr. Ransom opined that Plaintiff had moderate intellectual and behavioral limitations in a variety of areas that were consistent with a moderate psychiatric condition that would moderately interfere with her daily ability to function.  Dr. Ransom opined that Plaintiff's difficulties were secondary to her diagnosis that Plaintiff was suffering from a moderate bipolar disorder. (T. 751-752).

On January 4, 2021, Dr. H. Tzetzo, M.D., upon reviewing Plaintiff's medical records, opined that Plaintiff had marked limitations in the ability to understand and remember detailed instructions and carry out very short and simple instructions.  (T. 96).  He further opined that Plaintiff had moderate limitations in the ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. (T. 90-92). In addition, Plaintiff had moderate limitations in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept

instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (T. 95-99).  Dr. O. Fassler, Ph.D. subsequently conducted a file review and affirmed Dr. Tzetzo's opinion. (T. 110).

On January 4, 2021, Dr. G. Wang, M.D. reviewed Plaintiff's file as it existed on that date and opined that Plaintiff, who has a history of asthma, should avoid concentrated exposure to extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, and poor ventilation. (T. 93-95).  Dr. V. Baronos, M.D. subsequently conducted a file review and affirmed Dr. Wang's opinion. (T. 110).

In a treating medical source statement dated May 9, 2022, Plaintiff's treatment provider, Shirley J. Duane, PNP, from Spectrum Health and Human Services, completed a questionnaire regarding Plaintiff's diagnoses for the following: autistic disorder, bipolar disorder, anxiety, and major depression, single episode. (T. 1153). NP Duane treated Plaintiff through biweekly counseling sessions, psychiatric evaluation, and medication, including Risperdal and Prozac. (T. 1153-1158).

### 4.  The ALJ's Decision:

The ALJ  determined that Plaintiff had not attained the age of 22 as of January 1, 2020, her alleged onset date. (T. 20). Then, using the five-step sequential

analysis in 20 C.F.R. §§ 404.1520(a) and 416.920(a), the ALJ determined that Plaintiff's severe impairments were asthma, depressive and bipolar disorder, anxiety-related disorder, and PTSD. (T. 20-21). The ALJ found that despite her impairments Plaintiff could perform a full range of work at all exertional levels but that Plaintiff: must avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dusts, gases, and poor ventilation; could understand, remember, and carry out very short and simple instructions and perform simple tasks for 2-hour periods with standard breaks to complete an 8-hour workday; could occasionally interact with co-workers, but she cannot work in tandem with them, and she must have no more than incidental or superficial interaction with the public; and could perform simple tasks in an environment where infrequent decision-making is required, where she is not responsible for the safety of others, and where there are no more than occasional changes in the work setting or work processes. (T. 21-29). At step four, the ALJ found that Plaintiff was capable of performing her past relevant work as a hand packager in a chocolate factory. (T. 29-30).  At step five, the ALJ relied on the vocational expert's testimony that a hypothetical person with Plaintiff's age, education, work history, and RFC could perform unskilled jobs that exist in significant numbers in the national economy. (T. 30-31). Accordingly, the ALJ found that Plaintiff was not disabled and, therefore, not eligible for benefits. (T. 31-32).

## II.    LEGAL STANDARD

### A. Standard of Review

In reviewing a final decision of the SSA, a district court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. It is not this Court's function to make a *de novo* determination as to whether the claimant is disabled; rather, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn" to determine whether the SSA's findings are supported by substantial evidence. *Id*. The issue is not whether substantial evidence supports the claimant's argument, but "whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B. v. Colvin*, 523 Fed.Appx. 58, 59 (2d Cir. 2013) (italics omitted).

### B. Legal Standard to Determine Disability

To determine whether a person claiming benefits is eligible under the Act, the ALJ follows a familiar five-step sequential evaluation, determining: (1) whether the claimant is engaged in substantial gainful work activity; (2) whether the claimant has any "severe" impairments that significantly restrict his or her ability to work; (3) whether the claimant's impairments meet or medically equal the criteria of any listed impairments in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"), and if

they do not, what the claimant's residual functional capacity ("RFC") is; (4) whether the claimant's RFC permits her to perform the requirements of his or her past relevant work; and (5) whether the claimant's RFC permits her to perform alternative substantial gainful work which exists in the national economy in light of her age, education, and work experience. *See Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *see also* 20 C.F.R. §§ 404.1520 and 416.920(a).

The ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) (citation omitted). The ALJ need not, however, recite every piece of evidence that contributed to the decision so long as the record permits a reviewing court the ability to glean the rationale of the ALJ's decision.   *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013).

## III.    LEGAL ANALYSIS

Concluding that Plaintiff suffered from asthma, depressive and bipolar disorder, anxiety-related disorder, and post-traumatic stress disorder (PTSD), the ALJ determined that such "medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28. Considering treatment records, diagnostic test results and clinical abnormalities, the above impairments cause more than minimal limitations in performing basic work activities. Therefore, the above listed impairments are considered severe." (T. 20).  Notably, the ALJ then went on to state as follows:

> I recognize the substantial overlap in symptomology between different
> mental impairments, as well as the inherently subjective nature of mental
> diagnoses, including the claimant's alleged autism spectrum disorder
> (ASD). As such, the claimant's psychological symptoms and their effect
> on her functioning have been considered regardless of the diagnostic
> label attached. The medical evidence establishes that the above-noted
> impairments have been diagnosed by medically acceptable sources and
> the resulting symptoms, both singly and in combination, impede more
> than minimally upon the claimant's ability to engage in work-related
> activities. Consequently, they are "severe" impairments. (T. 20).

Notwithstanding the foregoing statement in the ALJ's decision, the Commissioner, in his brief to this Court, asserts that "the ALJ did not find ASD to be a severe impairment" and that "the ALJ did not find Plaintiff's limited intellectual functioning to be a severe impairment." Dkt. #9-1, pp. 8-9. Based upon the language cited above, however, this Court questions the accuracy of that assertion by the Commissioner.

Despite the Commissioner's characterization of the severity—or more accurately, the lack of severity—of Plaintiff's ASD and limited intellectual functioning, this Court finds that Plaintiff's extensive education records and medical records demonstrate that her ASD and limited intellectual function are well-documented and supported in the record before this Court. Notwithstanding the ALJ's suggestion that the diagnoses of such impairments is "inherently subjective," this Court concludes that the record contains significant objective evidence supporting such diagnoses. In the face of such evidence, which included: (1) data from three different years regarding Plaintiff's performance on the standardized WISC-IV intelligence test—with her most recent (albeit dated) 2015 test suggesting a FSIQ of 60; (2) medical records from the various providers who actually treated Plaintiff over a number of years; and (3) other evidence of Plaintiff's significant psychiatric history, the ALJ had

a duty to develop the record further regarding not only the severity of Plaintiff's ASD and limited intellectual functioning but also the impact that such conditions might have on her ability to function in the workplace.  For example, while Plaintiff's WISC scores—especially her most recent scores from 2015—suggested that Plaintiff has limited intellectual functioning, the reliability of such scores was called into question by their variability. (T. 1024-1031).  Moreover, since the WISC is—as its name suggests—intended for children, the record is devoid of any standardized testing information regarding Plaintiff's intellectual functioning as an adult.  That fact, combined with the fact that the scores which were available to the ALJ were dated, persuades this Court that the ALJ should have developed the record with valid IQ testing.  *See e.g., Garcia v. Comm'r, Soc. Sec. Admin.*, 768 F.3d 925, 930-931 (9th Cir. 2014)(where the Court recognized that since "IQ testing plays a particularly important role in assessing the existence of intellectual disability" when a case turns on the question of whether a claimant has an intellectual disability, a complete set of valid IQ scores are an essential part of a "full and fairly developed record." [citations, quotations, and alterations omitted]).

"[C]ourts have held that where ... psychiatric impairments are at issue, an ALJ has a heightened duty to develop the record due to the difficulties associated with evaluating a mental illness's impact on a claimant's ability to function adequately in a workplace." *Rodriguez v. Comm'r of Soc. Sec.*, No. 20-CV-3687 (VSB) (RWL), 2021 WL 4200872, at *21 (S.D.N.Y. Aug. 19, 2021), *report and recommendation adopted*, 20-CV-3687 (VSB), 2022 WL 874931 (Mar. 24, 2022); *see also, James Martin B. v. Comm'r of Soc. Sec.*, No. 1:23-CV-05170-GRJ, 2024 WL 3159844, at *3 (S.D.N.Y.

June 25, 2024); *Gabrielsen v. Colvin*, No. 12-CV-5694 KMK PED, 2015 WL

4597548, at *4-5 (S.D.N.Y. July 30, 2015)(collecting cases).

> "Ultimately, [t]he record as a whole must be complete and detailed
> enough to allow the ALJ to determine the claimant's [RFC]." *Rosario v.
> Comm'r of Soc. Sec.*, CIVIL ACTION NO. 20 Civ. 7749 (SLC), 2022 WL
> 819810, at *6 (S.D.N.Y. Mar. 18, 2022) (first alteration in original)
> (internal quotation marks omitted). "When there are inconsistencies,
> gaps, or ambiguities in the record, the regulations give the ALJ options
> to collect evidence to resolve these issues, including re-contacting the
> treating physician, requesting additional records, arranging for a
> consultative examination, or seeking information from others." Id. (citing
> 20 C.F.R. § 416.920b). Where there are no "obvious gaps" in the
> administrative record, and where the ALJ already possesses a
> complete medical history, "the ALJ is under no obligation to seek
> additional information in advance of rejecting a benefits claim." *Guillen
> v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017) (quoting Rosa v.
> Callahan, 168 F.3d 72, 79, n.5 (2d Cir. 1999)). "An ALJ's failure to
> develop the record warrants remand." *Id*.

*Crystal K., Plaintiff, v. Comm'r of Soc. Sec.*, No. 2:23-CV-670, 2024 WL 4471361, at

*11 (D. Vt. Oct. 11, 2024).  On the record before it, this ALJ had a duty to gather

additional information regarding the extent and impact that Plaintiff's limited

intellectual functioning and ASD might have on her ability to Court function in the

workplace.

Underpinning the ALJ's heightened duty in mental health cases such as this is

the recognition that the opinions of treating providers are "all the more important in

cases involving mental health, which are not susceptible to clear records such as x-

rays or MRIs."  *Flynn v. Comm'r of Soc. Sec.*, 729 F. App'x 119, 122 (2d Cir. 2018)

(summary order). "Although the 'treating physician rule' no longer applies, this

important principle persists, as the opportunity to observe and treat the claimant

constitutes important 'support' for a medical opinion under the new medical opinion review standard." *Pomales v. Acting Comm'r of Soc. Sec.*, No. 22 CIV. 6009 (AEK), 2023 WL 6240627, at *6 (S.D.N.Y. Sept. 26, 2023) (citation and quotations omitted); *see also Skartados v. Comm'r of Soc. Sec.*, No. 20-cv-3909 (PKC), 2022 WL 409701, at *4 (E.D.N.Y. Feb. 10, 2022) (explaining that an ALJ's obligation to develop the record by trying to obtain opinions from the claimant's treating sources "continues to exist even in cases involving claims filed after March 27, 2017, to which 'treating physician rule' does not apply").

Beyond the ALJ's failure appropriately to develop the record regarding Plaintiff's ASD and limited intellectual functioning, such deficiencies were exacerbated by the fact that the ALJ erroneously classified NP Duane—the only provider to render an opinion regarding Plaintiff's condition who actually treated Plaintiff—as "not an acceptable medical source." (T. 28-29). Contrary to the ALJ's conclusion, however, NPs are considered acceptable medical sources. *See*, POMS DI 22505.003. NP Duane, who had a treatment history with Plaintiff which included bi-weekly counseling sessions, psychiatric evaluation, and prescribing medication (T. 1153), opined that Plaintiff suffered from a "serious and persistent" mental disorder, which results in: a "marked impairment" in her ability to "understand, remember or apply information;" a "marked impairment" in her ability to "interact with others;" a "marked impairment" in her ability to "concentrate, persist, and maintain pace;" and a "marked impairment" in her ability to "adapt and manage oneself." (T. 1158). In addition, NP Duane identified nineteen (19) different areas in which Plaintiff suffered varying degrees of deficiencies in those mental abilities and aptitudes necessary to

perform unskilled work. (T. 1155-1156).  Among those deficiencies,  NP Duane found

that Plaintiff would be completely precluded from performing at all when it came to:

(1) the ability to get along with coworkers or peers without unduly distracting them or

exhibiting behavioral extremes; and (2) setting realistic goals or making plans

independently of others. (T.1156).

     Based upon the ALJ's incorrect suggestion that NP Duane was "not an

acceptable treating source," this Court cannot determine whether the ALJ erred in

finding MP Duane's opinion non-persuasive.  However, to the extent that the ALJ

suggested that such opinion ought to be discounted because it was provided on a

check-box form, such suggestion is wrong. *See Colgan v. Kijakazi*, 22 F. 4th 353,

361 (2d Cir. 2022)( "the evidentiary weight of a treating physician's medical opinion

can [not] be discounted by an ALJ based on the naked fact that it was provided on a

check-box form").

     Pursuant to the Revisions to Rules Regarding the Evaluation of Medical

Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68

(Jan. 18, 2017), applicable to claims, such as Plaintiff's, which are filed on or after

March 27, 2017, the Commissioner is no longer required to afford any specific

evidentiary weight to medical opinions, but is obligated to consider all medical

opinions and evaluate their persuasiveness based on the following five factors: (1)

supportability; (2) consistency; (3) relationship with the claimant; (4) specialization;

and (5) other factors, with particular importance placed upon consistency and

supportability. *Jacqueline L. v. Comm'r of Soc. Sec'y*, 515 F. Supp.3d 2, 7 (W.D.N.Y.

2021), *citing* 20 C.F.R. § 416.920c(a) & (c). To allow a reviewing court to trace the

path of an ALJ's reasoning, an ALJ is required to explain their consideration of the supportability and consistency factors by pointing to specific evidence in the record to support the ALJ's findings regarding medical opinions. *Id*., citing 20 C.F.R.§ 416.920c(b)(2).

On this record, the Court cannot conclude whether the ALJ erred in relying on the findings of consultant physicians who did not treat Plaintiff over the opinion of a treating source—whom the ALJ erroneously identified as an "not acceptable" treating source. *See James Martin B. v. Comm'r of Soc. Sec.,* 23-CV-5170, 2024 WL 3159844, at *4 (S.D.N.Y. June 25, 2024) (recognizing that although the treating physician rule no longer applies, treating sources are most able to provide a detailed, longitudinal picture of a plaintiff's medical impairment). Moreover, the "courts have 'repeatedly cautioned ALJs not to rely heavily on the findings of consultative physicians after a single examination,' particularly with respect to mental impairments." *Gregory D. v. Comm'r of Soc. Sec.*, No. 22-CV-313SR, 2024 WL 3886212, at *6 (W.D.N.Y. Aug. 21, 2024)(quoting S*antoro v. Comm'r of Soc. Sec.*, 703 F. Supp.3d 376, 387 (E.D.N.Y. 2024). Yet, that is precisely what the ALJ did here with respect to the consulting opinion of Dr. Ransom.

Finally, while the ALJ found the opinion of consultive physician Dr. Ransom to be persuasive, the ALJ failed to explain why she did not account for the more restrictive limitations found by Dr. Ransom in the RFC she crafted. Specifically, Dr. Ransom opined that Plaintiff had moderate limitations in a host of areas that included: understanding, remembering, and applying simple and complex directions and instructions; using reason and judgment to make work-related decisions;

interacting adequately with supervisors, coworkers, and the public; sustaining

concentration and performing a task at a consistent pace; sustaining an ordinary

routine and regular attendance at work; regulating emotions, controlling behavior,

and maintaining well-being; maintaining personal hygiene and appropriate attire; and

awareness of normal hazards and taking appropriate precautions. Dr. Ransom

concluded that these areas of difficulty were secondary to bipolar disorder, currently

moderate; and the results were consistent with a moderate psychiatric condition that

would moderately interfere with her ability to function on a daily basis. (T. 751). Dr.

Ransom diagnosed bipolar disorder, currently moderate. (T. 752).

Despite finding Dr. Ransom's opinion persuasive (T. 28), the RFC failed to

include any limitations accounting for the moderate limitations opined by Dr. Ransom

that Plaintiff would have in understanding, remembering, and applying simple

directions and instructions; interacting adequately with supervisors; sustaining

concentration and performing a task at a consistent pace; sustaining an ordinary

routine and regular attendance at work; and maintaining personal hygiene and

appropriate attire. (T. 24). While the RFC need not "perfectly correspond" with the

doctor's opinion, "[w]hat is required is that the ALJ explain the bases for his findings

with sufficient specificity to permit meaningful review." *Thomas v. Berryhill*, 337 F.

Supp. 3d 235, 244 (W.D.N.Y. 2018).

This Court finds that a remand is required so that a more complete and

comprehensive record can be developed.

**IV.    CONCLUSION**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. # 8) the is **GRANTED**, to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.  The Commissioner's motion (Dkt. # 9)  is **DENIED**.

**IT IS SO ORDERED**.

> *s/Richard J. Arcara*_____
> HONORABLE RICHARD J. ARCARA
> UNITED STATES DISTRICT COURT

Dated:  November 4, 2024
     Buffalo, New York